# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CRIMINAL NO. 3:2007-13 |
| | ) |
| ERIC HOLMES, | ) JUDGE GIBSON |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

This matter comes before the Court on the Defendant's Motion to Suppress Statements (Document No. 38). The Government opposes the motion. *See* Government's Response (Document No. 46). On July 1, 2008, the Court conducted an evidentiary hearing on the Defendant's motion. On September 19, 2008, the Defendant submitted Proposed Findings of Fact and Conclusions of Law (Document No. 63) and the Government submitted a Post-Hearing Brief (Document No. 64).

Original jurisdiction and venue are proper in this Court. *See* 18 U.S.C. § 3231 and Fed.R.Crim. P. 18.

## FINDINGS OF FACT

1. Lieutenant James Fedorka (Fedorka) is currently employed as a shift lieutenant at the Federal Correctional Institution at Loretto, Pennsylvania (Institution) where he has worked for twenty-three years. Transcript (Document No. 62)(T), p. 3.

2. During the events at issue in April 2007, Fedorka "was a special investigative supervisor", a position which "[a]t that time [he had occupied for] four and a half years." T, p. 3.

3. On April 10, 2007, Fedorka was told by Officer Bagley (Bagley) that he became aware through a telephone call that an inmate "possibly" possessed a weapon and Fedorka confirmed through another telephone to the detail foreman of the plumbing shop, Matthew Beck (Beck) that the inmate in question was at that hour at his work "assignment" in the Institution's plumbing shop. T, pp. 4-5, 25-26, 42.

4. The Defendant was the inmate suspected of possessing the weapon. T, pp. 4-5, 25.

5. Fedorka relayed this information to Officer Greg Wirfel (Wirfel) and Wirfel accompanied Fedorka to the plumbing shop to investigate. T, pp. 5, 24, 25-26.

6. Wirfel has been employed with the Bureau of Prisons at the Institution for over eleven years and has been an Special Investigative Services (SIS) technician at the Institution since June 2006. T, p. 24.

7. Fedorka and Wirfel entered the plumbing shop and Fedorka located the Defendant "seated at a table" and Fedorka "asked him to stand up and...guided him over to the wall in the plumbing shop, away from [as little as three or four, or as many as seven or eight] other inmates in the area so that [he] could pat search [the Defendant]." T, pp. 5, 6, 12, 14, 17, 26, 34.

8. When confronting the Defendant, Fedorka used "a normal voice" in requesting him to stand and in guiding the Defendant, Fedorka "placed [his] hand somewhere probably in his shoulder area and guided him over, over toward the wall area", near a counter, a distance of "[a]pproximately ten feet" without "pushing" or "shoving" the Defendant; Wirfel followed them. T, pp. 6-7, 10, 15, 17, 27, 30, 33, 48, 60.

9. The Defendant cooperated and the other inmates as well as Beck had the ability to observe the interaction between the Defendant and Fedorka. T, pp. 6-7, 47-48.

10. Fedorka "asked [the Defendant] if he had anything in his pockets...to which he replied no he didn't. [Fedorka] asked him if he had anything sharp, and [the Defendant] again replied no that he didn't." T, pp. 7, 18.

11. Fedorka's questioning of the Defendant is a procedure he and other officers typically use prior to beginning a pat search of an inmate for his own safety and throughout his questioning and during the entire conversation with the Defendant he used a "normal voice"; the Defendant was never "verbally threatened in any manner" and no one raised his voice during this interaction. T, pp. 6, 7-8, 9, 11, 19-20, 28-29, 32, 48.

12. Fedorka then "began [his] pat search" by removing the Defendant's coat and giving it to Wirfel to search while Fedorka had the Defendant "put his hands on the wall" and pat searched the Defendant; Fedorka uncovered "pens and pieces of paper" first. T, pp. 7-8, 17-18, 26-27, 27-28, 60.

13. Subsequently, Fedorka located within the Defendant's "left front pant pocket" his identification card ("about the size of a driver's license") with "white medical adhesive type tape" on the rear of the card covering an area the size of the length of the card but approximately one inch in

2

width. T, pp. 8-9, 29.

14. Fedorka inquired of the Defendant "what the packet [of tape] was and [the Defendant's] response was that it was a utility blade" and then Fedorka requested the Defendant to place his hands "behind his back so [he] could handcuff him" in accordance with "standard procedure"; the Defendant further explained that "he was using it to cut gaskets, and that Chucky ["another inmate"] had given it to him". T, pp. 9-10, 20-21, 29, 30, 32-33, 33-34.

15. The Defendant was then "escorted...directly to the special housing unit" by Fedorka who told Wirfel to remain and interview six inmates present in that area of the plumbing shop; Wirfel also searched the area where the Defendant was seated. T, pp. 10, 21, 30-31, 35-36.

16. Wirfel's interviews of the inmates who were in the plumbing shop at the time revealed that "none of the inmates said that [the Defendant] was helping them in any way" but some of them indicated that they themselves were using utility blades to cut gaskets while sitting at a table. T, pp. 31-32, 36, 38, 39-40.

17. "[O]ne or two of the [inmate interviewees] had a utility knife" on their person when they were interviewed by Wirfel because they were issued these knives in the plumbing shop. T, pp. 36-37.

18. Only Inmates Del Rosaria and Malott indicated that they were working when Wirfel entered the plumbing shop. T, pp. 38-39.

19. Approximately ten minutes elapsed from the time Bagley informed Fedorka of the possible weapon until the Defendant was taken to the special housing unit. T, pp. 10-11, 32.

20. The Defendant was never told by Fedorka that he was a suspect of a crime or that Fedorka was previously informed about the possible weapon. T, p. 11, 32.

21. In April, 2007, for an inmate to leave the plumbing shop at the Institution, he would have to pass through "locked security doors" to access "the compound" and an inmate is subject to a "random" search at the discretion of the foreman without "hav[ing] to pass through a magnetometer" T, p. 14.

22. The Defendant, like all other inmates "upon arrival" at the Institution, would have been instructed to submit to any staff member's request for a "pat search". T, p. 16.

23. The Federal Bureau of Investigation (FBI) was notified of the search and seizure of the weapon as a matter of routine practice. T, pp. 21-22.

3

24. The FBI was briefed by someone within Fedorka's SIS office regarding the incident and would have received SIS's file on the incident. T, p. 22.

25. The Defendant was not given his *Miranda* warnings prior to being searched by Fedorka; Fedorka knew that if he found a weapon, that the FBI would seek a mirandized statement from the inmate. T, pp. 22-23.

26. Matthew Beck (Beck) was the plumbing shop supervisor at the Institution in April 2007; he has been employed at the Institution for three years.

27. Beck has between seven and eighteen inmates assigned to the plumbing shop each work day. T, p. 53.

28. Those inmates assigned to the plumbing shop for that particular day who do not have any specific work assignments must remain in the plumbing shop. T, pp. 53-54.

29. The plumbing shop is an area of "[a]pproximately 15 [feet] by 20 feet" with Beck's office occupying seven feet by 20 feet of that space and typically contains between seven and eighteen inmates at any one time. T, p. 44.

30. Inmates assigned to the plumbing shop report to Beck who assigns them to a specific job for that day. T, pp. 51-52.

31. Inmates working in the plumbing shop have access to lockers in the shop for their use; del Rosaria's locker was searched after the April 10, 2007 incident with the Defendant. T, p. 57.

32. In assigning tasks to the inmates who work in the plumbing shop, Beck issues a written "tool pass" with the inmate's name on it that allows him to enter certain areas of the Institution to work on a plumbing issue and the "tool pass" will specify which tools the inmate would typically need in that day's work. T, pp. 45, 64-65.

33. "[A]ll tools require a tool pass"; "the tool room foreman [does] not...give any tools out unless [the inmate] had the pass". T, pp. 54, 61.

34. Michael Tresnicky (Tresnicky) is a correctional officer who has been at the Institution for nineteen years and was the "tool room officer" in April 2007. T, pp. 63-64.

35. Tresnicky's duties include "maintaining the tools of the institution", "accountability of shadow boards", "[issuance] of tools", overseeing the issuing of tools from [his] clerk". T, p. 64.

4

36. When dispensing tools to inmates with a tool pass, Tresnicky or his clerk review the tool pass, make sure it is completed properly, place the copy of the inmate's ID card unto a certain numbered slot on a board with each number having ten chips assigned to it; if the inmate needs "five tools", the tool room workers will "take five chips off of that [number]" and "the chips [are hung] on the shadow boards where [they] remove the tools from." T, p. 65, 77.

37. The tools "are checked to make sure they're serviceable when they go out" and they are handed to the inmate. T, p. 65.

38. Tools are issued once in the morning "at approximately eight o'clock" returned "about ten-thirty in the morning" and after lunch "the same process" is repeated at twelve-thirty and the tools are returned "[a]t the end of the workday"; each time the tools are returned the chips are removed from the shadow board for the tools that are returned. T, pp. 65-66, 70.

39. There are instances where tools are not checked back into the tool shop before lunch, but the tools are retained by the supervisor during the lunch hour, but when this occurs the supervisor contacts the tool room to notify the tool room officer that the supervisor is keeping the tools and usually keeps them in his office. T, p. 71.

40. Not all inmates assigned to the plumbing shop are permitted to obtain tools from the tool shop, but if they are, Beck sends a copy of that inmate's ID card to the tool room so that inmates handing out tools are aware of the names and identification of those inmates presenting tool passes; the Defendant was permitted to receive tools. T, pp. 61-62.

41. The Defendant has previously identified plumbing tasks in the Institution and Beck has permitted him to have tools to address these tasks. T, pp. 62-63.

42. Among the "basic tools [inmates] would typically carry" would be a "utility knife". T, p. 45.

43. The utility knife encompasses one piece that holds a second piece which is a "blade used to cut various items..."; a blade apart from its holder cannot be obtained, and should may not be possessed by an inmate and the utility knife may not kept overnight T, pp. 45-46, 47, 50, 54-55, 67.

44. A utility knife is only issued with one blade inside of it. T, p. 67.

45. An inmate using a utility knife requires supervision every two hours from Beck, that is Beck observes the inmate every two hours to ensure all of the tools assigned to the inmate are still in his possession; all supervisors of inmates with tools are to conduct this supervision every two hours. T, p. 58, 71.

5

46. Inmates obtain utility knives from the "central tool room" located "[a]pproximately 50 to 75 feet" from the plumbing shop. T, p. 46.

47. If a utility knife needs a blade replaced, the "tool room officer" in the central tool room would replace it. T, p. 55.

48. When returned to the tool room, all utility knives are checked to ensure they still include the blade. T, p. 67.

49. Dull blades on utility knives are replaced through an exchange in which Tresnicky gives a sharp blade to his clerk, Inmate Hunter, who gives Tresnicky the dull blade for placement in "secure A room." T, pp. 67, 69, 75.

50. Only Tresnicky's clerk or the clerk alternates are permitted into "secure A room." T, p. 75.

51. Inmates are not given a "new sharp blade separate from the handle" or permitted to keep a dull blade. T, pp. 67-68.

52. Inmates working in the plumbing shop obtain their tools from the central tool room by presenting their tool pass from Beck, return the tools at lunchtime, obtain the tools again after lunch and return them by 3:30 p.m. each day. T, p. 46.

53. The central tool room contains a shadow board on which all tools are placed when returned by an inmate; the use of the shadow board permits the manager of the central tool room to be aware of any missing tools. T, p. 55.

54. If a tool was not returned to Tresnicky's tool room prior to lunch, the "tool room is not clear and we do not feed lunch. We will go and search for that tool to find out where that tool is." T, p. 72.

55. On April 10, 2007, the Defendant reported to Beck, but Beck did not give the Defendant a work assignment for that day. T, p. 52

56. On April 10, 2007, only two inmates working within the plumbing shop were assigned to cut gaskets that day: Inmates Del Rosaria and Malott. T, p. 52.

57. Tresnicky did not issue a tool to the Defendant on April 10, 2007. T, pp. 78.

58. Inmates Del Rosaria and Malott were assigned utility knives and those two utility knives were returned to the central tool room on April 10, 2007. T, pp. 56.

6

59. Beck was not told by Fedorka why Fedorka was interested in the location of the Defendant in his telephone call of April 10, 2007; Beck received Fedorka's telephone call while in the tool room, left the tool room, returned to the plumbing shop and confirmed the Defendant's presence there before placing a return telephone call to Fedorka confirming the Defendant's presence in the shop. T, pp. 47, 58, 59, 60.

60. Beck did not issue a tool pass to the Defendant for a utility knife on April 10, 2007. T, p. 49.

61. Beck admitted that while it is not permitted, inmates do share their tools with other inmates. T, pp. 49-50, 56.

62. The Defendant never requested a tool pass for a utility knife and he did not request to leave the plumbing shop on April 10, 2007. T, p. 50.

63. Beck did not direct Defendant to help nor did he observe the Defendant helping any other "inmate cutting gaskets on [April 10, 2007]" T, p. 50.

64. "Inmates are issued...Class B tools" which are restricted to "any tool that can't cut metal"; "[a] utility knife ... is a Class B tool." T, p. 64.

65. Tresnicky does not recall on April 10, 2008 receiving a tool pass for the Defendant, the Defendant being in the tool shop or being issued a utility knife on that day, and additionally he did not issue a blade to the Defendant on April 10, 2007. T, p. 68.

66. Tresnicky is no longer the tool room officer or foreman as that position is a rotating position; he is "now a medical escort officer." T, p. 69.

67. It is unknown whether the blade possessed by the Defendant "was issued out of the tool room at some time" or if it entered the Institution in some other manner. T, pp. 72-73.

68. If a tool is missing, the Institution is locked down and a search for the tool is conducted until the administrators of the Institution decide to remove the Institution from lock down. T, p. 74.

69. If a tool is missing, the inmate assigned that tool is placed in the secure housing unit and the inmate is "questioned as to where it is". T, p. 74.

70. The blade recovered from the Defendant could not "be traced back to a specific inmate who checked it out" because Tresnicky "never knew of any blade that went missing" T, p. 75.

71. Special Agent Arnold P. Bernard (Bernard) of the Federal Bureau of Investigation opened the investigation into the Defendant's possession of the razor blade after being "notified by the SIS

7

office by telephone" of the "incident." T, p. 81.

72. Bernard went to the Institution, obtained the evidence which was the Defendant's ID card with "a wrapped up piece of white medical type tape, which was wrapped around a playing card, a four of spades blue card with black four of spades on there, and a utility blade." T, pp. 81-82.

73. The Defendant was presented to Bernard in leg shackles and handcuffs, and Bagley removed the handcuffs prior to Bernard speaking with the Defendant. T, pp. 82, 90.

74. Bernard also spoke with the Defendant after introducing himself, the nature of his business with the Defendant and orally reading the Defendant his *Miranda* rights; subsequently, Bernard reviewed with the Defendant a waiver of rights form which he signed, thereby evidencing his waiver. T, pp. 82-83; Government Exhibit 1.

75. The Defendant indicated that he could read and understand the English language prior to reading and signing Government Exhibit 1. T, pp. 83-84.

76. After the Defendant indicated that he was willing to speak with Bernard, Bernard began his interview of the Defendant. T, p. 84.

77. The Defendant stated to Bernard that Inmate Del Rosaria gave him the blade found in his possession while he was cutting gaskets, that he wrapped it up "in a playing card, wrapped tape around it, and put it under his identification card" prior to going to the restroom and "upon return picked that up, put it in his pocket, and that's when the SIS officers came in and found that item on his person." T, p. 84, 85.

78. Prior to his interview of the Defendant, Bernard was informed that Inmate Del Rosaria a/k/a "Chucky" gave the blade to the Defendant. T, p. 88.

79. The Defendant also admitted to Bernard that he kept the blade "in his locker" and that other inmates used it as well. T, pp. 85, 92.

80. Bernard interviewed the Defendant in a library in the vicinity of the special housing unit of the Institution as the two sat across a table from each other with Bagley standing to the right of Bernard; Bernard used a "normal conversat[ional]" tone of voice with the Defendant. T, p. 85.

81. The Defendant never indicated to Bernard that he wished to have an attorney or that he did not want to speak with him anymore. T, p. 86.

82. Bernard was aware that the Defendant admitted to possessing the blade prior to his interview of the Defendant, but Bernard did not tell the Defendant that this previous admission could not

8

be used against him prior to being introduced. T, p. 87.

83. On April 12, 2007, Bernard was not aware if the Defendant was given a choice to speak or not to speak with Bernard. T, p. 90.

84. Bernard's April 12, 2007 interview of the Defendant lasted approximately fifteen minutes and Bernard never withheld food, water or a bathroom break from the Defendant; Bernard never threatened the Defendant, promised him anything, or otherwise played "[a]ny psychological games" with the Defendant. T, pp. 93-94.

## CONCLUSIONS OF LAW

1. Prior to commencing custodial interrogations, law enforcement is required to advise an individual in custody of his/her Miranda rights. *Miranda v. Arizona*, 384 U.S. 436, 478-479 (1966); the individual need not be questioned regarding the offense for which he/she is held in custody. *Mathis v. United States*, 391 U.S. 1, 4-5 (1968).[1]

2. Prison inmates are not assumed to be in custody for purposes of *Miranda* because they are confined to a penal institution. *United States v. Conley*, 779 F.2d 970, 972-973 (4th Cir. 1985); *Garcia v. Singletary*, 13 F.3d 1487, 1491 (11th Cir. 1994)(adopting reasoning of *Conley*).

3. *Conley* relied upon *Cervantes v. Walker*, 589 F.2d 424, 428 (9th Cir. 1978) which set forth four guidelines for determining if a prisoner has been placed in custody aside from being imprisoned:

   > Therefore, the language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him must be considered to determine whether a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting. Such a situation requires Miranda warnings.

   *Cervantes v. Walker* 589 F.2d 424, 428 (9th Cir. 1978).

4. The Defendant objects to the application of *Cervantes* and its factors because he views the Supreme Court case of *Mathis v. United States,* 391 U.S. 1 (1968) as requiring the reading of *Miranda* rights to all prisoners who are questioned by law enforcement, however this Court, like the *Cervantes* court "[does] not read *Mathis* so broadly"; *Mathis* did not address the issue of

---

[1] Because the Defendant seeks suppression of statements made while he was in custody, this case is a *Miranda* case and does not center upon a voluntariness issue. *Cf. United States v. Walton*, 10 F.3d 1024, 1028 (3d Cir. 1993)(applying the law concerning voluntariness of a statement to a noncustodial encounter with a police officer).

9

custody, but assumed it existed for its pruposes when addressing two other issues raised by the Government in its attempt to evade the requirements of *Miranda* for prisoners. *Mathis* at 4.

5. In the absence of controlling precedent from the Third Circuit Court of Appeals on this issue, *see Alston v. Redman*, 34 F.3d 1237, 1245 n. 6 (3d Cir. 1994), the Court adheres to the guidelines set forth in *Cervantes* to conduct its analysis of the questioning of the Defendant in the plumbing shop.

6. The Defendant was on his work assignment on the morning of April 10, 2007 and was not subject to any physical restraint in the form of handcuffs or leg shackles and when confronted by Fedorka, the Defendant responded to Fedorka's command to stand and Fedorka's guidance to walk away from the table he was sitting and over to a counter or wall ten feet away; Fedorka's command was accompanied by an assertion of physical direction in the form of Fedorka's hand on the Defendant's should leading the Defendant to the location Fedorka wanted the Defendant to be.

7. The Defendant submitted to Fedorka's command in accordance with prison procedure that was known to him prior to Fedorka's entry into the plumbing shop; the Defendant subsequently submitted to Fedorka's command to the Defendant to place his hands on the counter or wall to facilitate Fedorka's frisk of the Defendant.

8. These commands from Fedorka clearly weigh in favor of the Defendant being in custody at the time of the April 10, 2007 frisk of the Defendant because the Defendant was otherwise present at his job assignment in the prison and conducting himself without directions or restriction other than the rules in place for his work in the plumbing shop and the Institution generally.

9. Fedorka's command to stand up, to which the Defendant was responsive in accordance with Institution rules, was not binding upon the Defendant until voiced to him.

10. The combination of a verbal command and physical touching and direction worked to together to alert the Defendant that he must submit to Fedorka's directions.

11. The physical surroundings of the interrogation remained the Defendant's prison workplace, but now the Defendant was separated from his fellow inmates and co-workers, flanked by two SIS officers with directions to place his hands on the counter or wall before him and place himself in a submissive stance.

12. Furthermore, Fedorka had the Defendant remove the coat he was wearing and handed it to Wirfel.

13. Fedorka's questions for the Defendant were not pointed toward the subject of a razor blade or contraband, but toward objects in his pockets and if there were sharp objects in his pockets; these questions were made prior to a frisk of the Defendant in furtherance of Fedorka's own safety.

14. Fedorka never confronted the Defendant with evidence of or the accusation of his guilt in possessing contraband, but it was clear that Fedorka singled the Defendant out for a search without telling the Defendant what was the target of search and it was clear that Fedorka believed him to possess something that no other inmate in the plumbing shop at the time possessed; Fedorka's acts, without verbal accusation, focused suspicion upon the Defendant and not the other plumbing shop workers and as a result the actions of Fedorka and Wirfel alerted the Defendant that he was being searched for something in his possession.

15. Fedorka and Wirfel did not present any manner of force to require compliance on the part of the Defendant, but they did address the Defendant with a verbal command and a physical direction in a concerted, intentional effort to frisk the Defendant.

16. The Defendant complied with Fedorka and Wirfel and did not resist, but the absence of resistance and any need for force to restrain a suspect does not diminish the effect of the actions which sought his submission to a frisk search of his body; arrests can occur through cooperation or resistance, and resistance to arrest must be met with greater force to subdue the suspect while cooperative suspects who are submissive to police requests, must still be requested to submit and otherwise submit despite the fact that only a minimal potential for forcible compulsion to the police custody exists.

17. Therefore, the Court finds that all of these factors weigh in favor of finding that the Defendant was in custody at the moment he was directed by Fedorka to stand up and walk away from the table at which he was sitting; being in custody, verbal questioning or actions intended to result in the Defendant making incriminating statements must be suppressed in the absence of *Miranda* warnings. *Rhode Island v. Innis*, 446 U.S. 291, 300-302 (1980).

18. *Innis* recognized that "since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 301-302.

19. The testimony indicated that Fedorka routinely asked the two questions regarding an inmate's possession of objects and sharp objects, but responses to these questions would certainly place the Defendant in the potential position of responding that he possessed a weapon, which is exactly what Fedorka suspected and was his basis for frisking the Defendant.

11

20. However Fedorka's routine questions to the Defendant are be considered to be permissible under the "'public safety' exception" to *Miranda* set forth in *New York v. Quarles*, 467 U.S. 649, 655-656 (1984) (and left uncited in the case *sub judice* by both parties) because it is related: in *Quarles* the officer was told that the suspect would have a firearm and an empty holster under the suspect's arm was observed when he was apprehended.

21. The absence of the firearm in *Quarles* not only presented a threat to the police officers but also the safety of the public; however, the concern for the presence of an object that might harm the arresting officer has been found to be a basis for a routine safety question of the suspect arrested. *See United States v. Young,* 186 F.Supp.2d 642, 646 (E.D.VA. February 7, 2002)(finding that *Quarles* permits asking a suspect in custody if he possesses any "sharp objects, knives, needles, or guns" prior to mirandizing the suspect) and *United States v. Johnson*, 95 Fed.Appx. 448, 452 (3d Cir. 2004)(questioning the Defendant during a frisk if he had a firearm was permitted under the "'public safety' exception" of *Quarles*).

22. Fedorka as the officer whose task it was to frisk the Defendant certainly had a concern for his safety from sharp objects or other dangerous matter and so his questioning using the two routine pre-frisk questions (see FOF 9, 10) is permissible in the absence of *Miranda* warnings pursuant to *Quarles*.

23. However, it does not appear that *Quarles* would apply to Fedorka's subsequent questioning of the Defendant regarding his identification badge with white medical tape because it is implied from the record at that point that Fedorka had completed his frisk of the Defendant, Fedorka had the ID badge in his possession and it was not concealed and the Defendant was without possession of the razor blade attached to the ID badge and therefore unable to harm Fedorka.

24. Thus, the public safety exception of *Quarles* does not extend to Fedorka's question regarding what the packet of tape was on the ID badge and, without being mirandized, the Defendant's response to the question that it was a razor blade must be suppressed and may not be introduced in the Government's case-in-chief at trial.

25. Fedorka's questioning of the Defendant regarding this object was the beginning of his investigation of contraband and was unrelated to his safety in frisking the Defendant; Fedorka could just have easily refrained from questioning the Defendant and inspected the object himself.

26. Fedorka, who was alerted to the possible presence of a weapon, questioned the Defendant regarding the nature of the object, which in accordance with *Innis* was intended to elicit an incriminating response while the Defendant was held in custody.

12

27. Proceeding to the second statement, the precedent of *United States v. Kiam*, 432 F.3d 524, 532 (3d Cir. 2006) controls and this Court must utilize the analysis set forth in Justice Kennedy's concurring opinion in *Seibert* wherein he developed a two-step process: if a "two-step interrogation technique was used in a calculated way to undermine the Miranda warning" "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made" but when no use of the two-step interrogation occurs, the rule of *Oregon v. Elstad*, 470 U.S. 298 (1985) controls. *Missouri v. Seibert*, 542 U.S. 600, 622 (2004).

28. The Supreme Court in *Elstad* summed up its opinion as follows: "We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." *Oregon v. Elstad*, 470 U.S. 298, 318 (1985).

29. Fedorka continued his questioning of the Defendant in a manner that flowed from his curiosity of the object seized as a result of the frisk; Fedorka's manner in addressing the Defendant was not coercive despite the fact that the Defendant was in custody.

30. Although Fedorka was aware that the FBI would read the Defendant his *Miranda* rights, it does not appear that Fedorka himself deliberately attempted to overcome *Miranda* by eliciting a confession from the Defendant before the FBI questioned him; however, Fedorka's questioning of the Defendant regarding the nature of the object seized violates *Miranda* and the Defendant's statements in response must be suppressed.[2]

31. The Defendant's second statement made on April 12, 2007 to Bernard after being mirandized was made voluntarily.

32. Agent Bernard's April 12 interview of the Defendant occurred two days after he had been taken into custody by Fedorka; Agent Bernard mirandized the Defendant and conducted a fifteen minute interview in a different room, a library outside of the Defendant's special housing unit cell.

---

[2] Had this Court adopted the reasoning of the Defendant and concluded that *Mathis* establishes that interrogation of any prison inmate without a reading of *Miranda* warnings violates the Fifth Amendment, this Court would have ruled in the same manner. This Court has concluded that he was in custody as a result of Fedorka's actions; Defendant's reading of *Mathis* would result in a finding of custody as well. However, in either instance under *Miranda*, the "public safety" exception in *Quarles* would still apply to permit questioning of the Defendant without a reading of *Miranda* rights and questioning beyond that needed for the officer's safety would result in those answers being suppressed. Furthermore, in determining that the first questioning concerned the application of *Miranda* and the exception set forth in *Quarles* we need not address the Defendant's alternative argument regarding voluntariness and coercion. Defendant's Findings, ¶¶ 35-37.

13

33. Bernard was accompanied by Bagley not Fedorka, but it was Agent Bernard who conducted the questioning; it is unknown whether he invoked the Defendant's prior statement during questioning, but no matter what the content of this fifteen minute interview, it did concern the same subject matter as the questioning of the Defendant by Fedorka two days prior.

34. Bernard's investigation resulted in the present indictment.

35. The Defendant waived his rights under *Miranda* after Bernard read the Defendant the *Miranda* warnings and the Defendant signed a written waiver of rights form. *See* Government Exhibit 1.

36. Even in light of similar subject matter, the circumstances of the second round of questioning by Bernard did not result in a "deliberate" violation of *Miranda* similar to that described by Justice Kennedy in *Seibert*; two days had elapsed since the Defendant's initial questioning and placement in the special housing unit, the identity of those present at the interview had changed, the location of the interview had changed, the Defendant was read his *Miranda* warnings by Bernard, a special agent from the FBI and not a member of the Institution's staff.

37. The Court recognizes that the Defendant believes that Fedorka and others in the Institution follow a policy of not mirandizing inmates before questioning them regarding contraband even though they will have the inmate prosecuted through the efforts of the FBI, but where contraband is of a nature that it is a weapon (which is clearly relevant to officer safety) *Quarles* permits the questioning of that inmate under the "'public safety' exception" of *Miranda*.

38. Therefore, as to the case *sub judice*, the Defendant's renewed request for discovery of materials including "Special Investigative Service Supervisor Manual, PS 1380.05" is denied.[3] Defendant's Proposed Findings, ¶ 46.

39. The Defendant also argues that the curative measure suggested in *Kiam* of indicating to the individual being questioned that his previous, unmirandized statement cannot be used against him was not employed by Bernard, but this argument fails to recognize the additional suggested curative measure of "a sufficient break in time or circumstances between interrogations". *Kiam* at 532.

40. Waiver of the right to remain silent and the right to speak to an attorney must be a voluntary, knowing and intelligent waiver. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

---

[3]Other instances of custodial questioning that are not permitted by *Quarles* are not before the Court.

41. Additionally, as cited by the Government, the waiver of the rights to remain silent and to have an attorney must be proven by the Government "by a preponderance of the evidence". *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

42. Had this Court agreed with the Defendant that there was an intentional two-step process of questioning of the Defendant in an attempt to subvert *Miranda*, the circumstances are such that despite being confined to the special housing unit, a two day break in time and change of investigators, particularly the change of agencies investigating the matter from Bureau of Prisons personnel to the FBI, are sufficient curative measures to permit the admission at trial of the Defendant's statement given to Bernard.

43. Despite not telling the Defendant that his previous statements regarding the contraband would be inadmissible, Bernard's taking of the Defendant's statement occurred after a voluntary, knowing and intelligent waiver of his Fifth amendment rights.

44. The Defendant's statements to Bernard are thus admissible at trial.

45. The Defendant alternatively argues that despite the giving of *Miranda* warnings by Bernard that his waiver of rights and his statements following it were not made voluntarily because of his previous questioning on the same topic, his placement in "isolation for two days" and the fact that he was brought forward to speak with Agent Bernard while "in shackles for further questioning on the same topic." Defendant's Proposed Findings, ¶ 47.

46. "A necessary predicate to a finding of involuntariness is coercive police activity." *United States v. Jacobs* 431 F.3d 99, 108 (*citing Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

47. It is the Government's burden to prove the voluntariness of any statement after a consideration of the "totality of the circumstances". *Jacobs* at 108-109 (citations omitted).

48. The Government has demonstrated that Bernard and Bagley did not physically or psychologically threaten, coerce or intimidate the Defendant in the April 12 questioning; the Defendant made the choice to cooperate, answer questions and give a statement regarding the contraband found on his person.

49. The Defendant clearly has a history of exposure to the criminal justice system through his past conviction and current incarceration, so questions of the possibility of his will being overcome by the presence of correctional officers or law enforcement questioning him and his confinement in shackles or being placed in a special housing unit away from other prisoners are of minimal influence in his decision to waive his right to remain silent; there is no evidence that the Defendant was not given food or water, that he refused to speak with Bernard or that he was otherwise held in isolation until he submitted to answering questions from Bernard.

15

50. The Defendant's position encompasses too broad a range of circumstances: if every individual who was confined alone in prison and made to wear shackles to an interview was considered to have been subject to coercion, no jail or prison interviews inmates could be introduced at trial despite the inmate's voluntary waiver of his rights after being read Miranda warnings.

**AND NOW**, this 19th day of December, 2008, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Defendant's Motion to Suppress Statements (Document No. 38) is GRANTED IN PART as to any statements of the Defendant made in response to Lieutenant Fedorka's questioning after the Defendant was searched on April 10, 2007; and DENIED IN PART as to all statements made by the Defendant prior to and during Lieutenant Fedorka's search of the Defendant on April 10, 2007 and as to all statements made by the Defendant on April 12, 2007 to Special Agent Bernard.

**BY THE COURT:**

**KIM R. GIBSON,
UNITED STATES DISTRICT JUDGE**